DA 11-0097

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 12

STATE OF MONTANA,

     Plaintiff and Appellee,

     v.

BLAINE CHRISTOPHER FADNESS,

     Defendant and Appellant.

APPEAL FROM:     District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-06-178
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Joslyn Hunt, Chief Appellate Defender, Jennifer A. Hurley, Assistant
Appellate Defender, Helena, Montana

     For Appellee:

          Steve Bullock, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

          William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs:  November 9, 2011

Decided:   January 17, 2012

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Blaine Christopher Fadness appeals from the Opinion & Order of the Twenty-First Judicial District Court, Ravalli County, disposing of certain items held as evidence by the Ravalli County Sheriff's Office. We affirm in part, reverse in part, and remand for further proceedings as detailed below.

## BACKGROUND

¶2 On the evening of September 11, 2006, Fadness shot at three different moving vehicles while traveling on U.S. Highway 93 south of Darby, Montana. In each case, Fadness was driving south and the victim was driving north when Fadness fired the shot. The shootings occurred after dark over a period of about 22 minutes. One of the victims was hit in the knee and had to undergo surgery to have the bullet removed from her body. In the other two cases, the victims did not suffer physical injuries because the bullets did not pierce the inner walls of their vehicle doors.

¶3 The first victim notified local law enforcement immediately upon realizing that his vehicle had been struck by a bullet. In reviewing video footage from a traffic camera on Main Street in Darby, he was able to identify a suspect vehicle. Using this information, law enforcement officials located and arrested Fadness, who was still driving south on Highway 93. When Fadness was arrested, deputies observed a Walther .22-caliber pistol with a laser sight and a silencer lying on the front seat of his vehicle, within arm's reach of the driver. They also discovered a Beretta .22-caliber pistol on the front seat within Fadness's reach. Subsequent testing indicated that the Walther .22, with the laser sight and silencer, was the gun Fadness had used in the shootings.

¶4     Deputies obtained a search warrant for Fadness's vehicle.  In that search, they found additional firearms, specialized accessories for the firearms (e.g., a range finder, tactical holsters, and speed loaders), a considerable amount of ammunition, twelve spent .22 cartridges, and some specialized outdoor equipment (e.g., a night-vision device and tactical flashlights designed not to disclose the user's location).  All of these items were admitted into evidence at Fadness's trial.

¶5     The State charged Fadness with three counts of attempted deliberate homicide.  At trial, Fadness admitted the shootings but claimed he never thought that he would actually hit anyone or anything.  When asked why he had shot at the victims, Fadness replied: "Just stupid, angry, just nothing more than just frustration at high beam.  Try to clip them thinking they're going to dim them down.  No reason, no good common sense, anything.  Just throwing a water balloon out the window would have been about the same stupidity, but different results."  Fadness said it was "an incredibly stupid act of road rage."

¶6     The jury convicted Fadness on all three counts, and the District Court sentenced him to the Montana State Prison for three concurrent terms of 40 years with 20 years suspended.[1]  The court listed numerous conditions on the suspended portion of Fadness's sentence, including that he "not own, possess, or be in control of any firearms or deadly weapons" and that he "comply with all city, county, state, and federal laws."  Fadness

---

[1] Citing "D.C. Doc. 115," which is the District Court's Amended Judgment and Commitment, Fadness and the State both assert in their briefs that he was committed to *the Department of Corrections* for 40 years with 20 years suspended.  But the District Court's Amended Judgment and Commitment clearly states that Fadness is committed to "the Montana State Prison" for a period of 40 years with 20 years suspended.  Fadness is placed "under the supervision of the Department of Corrections" only for the suspended portion of his sentence.

3

appealed, and this Court affirmed his conviction in *State v. Fadness*, 2008 MT 441N. The Sentence Review Division heard Fadness's application for review of his sentence on November 12, 2009, and thereafter unanimously affirmed the sentence.

¶7 The instant appeal arises out of a Petition for Order for Disposing of Evidence, which the Ravalli County Attorney filed in the District Court on July 30, 2010. Sections 46-5-306 through -309, MCA, "provide a procedure by which physical evidence in criminal cases may be destroyed or appropriated for law enforcement use when prosecutions have been completed and no further legal proceeding is contemplated or when it does not appear that criminal charges will be initiated." Section 46-5-306, MCA. The prosecutor commences the procedure by filing a petition for the destruction, disposal, or use of the evidence. Section 46-5-307, MCA. The petition must include or describe the information specified in subsections (1) and (2) of § 46-5-307, MCA. Among other things, the prosecutor must state "whether, in those instances in which the items are not contraband, an effort has been made to return the items to the apparent owner and the results of the effort." Section 46-5-307(1)(f), MCA. The prosecutor is also required to present to the court a proposed order. Section 46-5-308(1), MCA. The proposed order may include: authorization to destroy all contraband listed in the petition; authorization to use contraband or noncontraband items for training or law enforcement purposes; if the evidence is money and the owner cannot be ascertained and no civil forfeiture action is pending, authorization to deposit the money to the appropriate city, county, or state drug forfeiture fund; authorization to sell noncontraband property at public sale or auction; or authorization to destroy all items not otherwise provided for. Section 46-5-308(1)(a)-(f),

4

MCA. The court, in turn, "may enter an order providing for the destruction or disposition of the evidence." Section 46-5-308(1), MCA.

¶8 Prior to filing the petition in the instant case, the Ravalli County Attorney helped facilitate the release, to Fadness's parents, of all items of Fadness's personal property which were not contraband and which had not been admitted at trial. The prosecutor's petition, therefore, concerned only items which had been used as exhibits at trial or which were contraband. All of these items were listed in Paragraphs 7a through 7e of the petition. Paragraph 7a contained noncontraband "exhibit items." The parties agreed that these items would be released to Fadness's parents. Paragraph 7b listed several "exhibit items to be retained and used," such as maps, photographs, a 911 tape, a medical report, and a crime scene analysis. Fadness did not object to this disposition. Paragraph 7c, which is labeled "exhibit items to be destroyed," contained no items. Paragraph 7e listed "contraband items to be disposed of by court order." Fadness agreed that these items should not be returned to him or to his parents.

¶9 The dispute in this case concerns the items listed in Paragraph 7d. They include firearms, dangerous weapons, ammunition, and other equipment. The prosecutor sought an order giving him authority to sell these items at public sale or auction, or to a licensed firearms dealer, with the proceeds from the sale to go to Fadness's parents to be held on Fadness's behalf. The prosecutor explained that his request to sell the items was due to Fadness's status as a convicted felon, since it is unlawful under 18 U.S.C. § 922(g)(1) for a person who has been convicted in any court of a felony to possess firearms or ammunition. Moreover, one of the conditions on the suspended portion of Fadness's

5

sentence prohibited him from owning, possessing, or being in control of any firearms or deadly weapons. The prosecutor argued that releasing the items in Paragraph 7d to Fadness's father and mother (who, at the time, were 84 and 80 years old, respectively) would give Fadness "constructive possession" of the items. The prosecutor pointed out that Fadness had a key to his parents' house; that Fadness did not currently own his own residence and would likely have access to his parents' home upon his release from prison; that Fadness's parents currently held some of Fadness's personal property in trust for him; and that if released to Fadness's parents, the items at issue would be comingled with Fadness's other property already at their home, thus giving him dominion and control over his firearms and other weapons. The prosecutor cited federal caselaw[2] for the proposition that Fadness's family could not hold his firearms in trust for him.

¶10 Fadness countered that he would not have possession of the items in Paragraph 7d if they were returned to his parents. He asserted that he neither owned his parents' house nor exercised dominion and control over the property inside. Moreover, he pointed out that he will be either incarcerated or under the supervision of a probation and parole officer for the next 37 years. Fadness cited state and federal cases in support of his argument that releasing property to a third party does not constitute constructive possession by a defendant who is prohibited from possessing that property.

_____

[2] The prosecutor did so premised on the 1991 Chapter Comments to Title 46, chapter 5, MCA, which indicate that, "[w]hen appropriate," the statutes in Title 46, chapter 5 may be "compared with the Federal Rules of Criminal Procedure or the Uniform Rules of Criminal Procedure." Montana Code Annotated, Annotations 2010, at 41. The federal cases cited by the prosecutor and discussed below involved Rule 41(g) of the Federal Rules of Criminal Procedure, which provides for the return of seized property.

6

¶11 The District Court held a hearing on the matter on November 17, 2010, at which Fadness and his father testified. Fadness clarified that his intention in opposing the prosecutor's petition was to ensure that he got a "fair price" for his guns "rather than a few pennies on the dollar for what they are worth." Fadness stated that he was *not* trying to get his guns back. He acknowledged that "I'm never going to be touching a gun again, period. So my main concern then is just being able to sell it at a fair price." In this regard, Fadness objected to the prosecutor's proposal to sell his firearms at public sale or auction. He explained:

> I've been to other auctions in the past where things have been seized. The last one was the gentleman that committed suicide, and his items were sold very, very cheap to the general public. And I just want to get a fair price for whatever value of the different firearms are. So that way, when I do finally get to where I can have something, I can get a couple bucks so I can have the first and last month's rent, security deposit, and try to get started on my own again. And that will help towards it.

Fadness indicated that, in his view, he would not get a fair price for his guns unless his parents sold them. Thus, he also objected to the District Court's proposed compromise of selling the guns on consignment, at fair market value, through a licensed firearms dealer with a retail used gun establishment in Ravalli County or Missoula County.

¶12 Fadness's father, Chuck Fadness, testified that if the weapons were released to him, his intention would be to sell them. When asked "why not have the County sell them," Chuck responded that "they don't sell like we would. You know, they're going to sell something for almost nothing through an auction or something." However, when questioned by the District Court judge as to how he would go about selling the guns, Chuck admitted that he had no plan and "hadn't really given it any thought." Chuck

7

"imagined" that he might advertise them in the paper. Chuck did not oppose the idea of consignment if it would get Fadness "the most for [his guns]." As for Fadness's ability to access weapons in his parents' house after his release from prison, Chuck opined that he (Chuck) could lock up his own weapons, as well as any of Fadness's weapons that had not been sold, in a metal gun case and put the key in a safe deposit box at a bank.

¶13 The District Court issued a detailed Opinion & Order addressing the cases cited by the parties and the testimony given at the hearing. The court found that "Fadness wants his weapons released [to his parents] in trust for him" in order that "they may be sold and he may receive the proceeds." The court noted that this fact distinguished the instant case from two of the cases cited by Fadness: *United States v. Parsons*, 472 F. Supp. 2d 1169 (N.D. Iowa 2007), and *State v. Severson*, 2000 Mont. Dist. LEXIS 1878 (21st Jud. Dist. May 25, 2000). In both *Parsons* and *Severson*, the defendant did not seek to have a third party hold his firearm collection in trust for him. Rather, he sought to designate the person to whom his firearm collection should be given outright, with no expectation by the defendant of exerting control over the firearms thereafter or of receiving proceeds from their sale. In both cases, the court concluded that such an arrangement would not afford the defendant constructive possession of the firearms. *Parsons*, 472 F. Supp. 2d at 1174-77; *Severson*, 2000 Mont. Dist. LEXIS at **5-6.

¶14 In contrast, the District Court observed that "Fadness is not merely designating to whom his significant collection of firearms and ammunition should be given, but rather . . . Fadness seeks to have his items placed in the possession of his parents in order that they may be sold for his benefit." The District Court determined that none of the cases

8

reviewed by the court supported such a disposition. In *United States v. Felici*, 208 F.3d 667 (8th Cir. 2000), the Eighth Circuit ruled that the defendant was "not entitled to have the firearms held in trust for him by a third party" because "[s]uch a request suggests constructive possession" and "[a]ny firearm possession, actual or constructive, by a convicted felon is prohibited" by 18 U.S.C. § 922(g)(1). 208 F.3d at 670. In *United States v. Howell*, 425 F.3d 971 (11th Cir. 2005), the defendant—like Fadness here— sought "to either place the firearms in the possession of a relative in trust or sell the firearms and distribute the proceeds to him." 425 F.3d at 976-77. The Eleventh Circuit noted that such a disposition "is beyond the scope of" Rule 41(g)[3]; but regardless, the court agreed with the Eighth Circuit that having firearms held in trust suggests constructive possession, and any firearm possession, actual or constructive, by a convicted felon is prohibited by federal law. *Howell*, 425 F.3d at 977. Notably, the court left open the possibility that the defendant could file an action under 42 U.S.C. § 1983 for the value of the firearms. *Howell*, 425 F.3d at 977 n. 4. Finally, in *United States v. Garman*, 2006 U.S. Dist. LEXIS 53616 (W.D. Wash. Aug. 2, 2006), the defendant "concede[d] that he may not *possess* the firearms under 18 U.S.C. § 922(g), but argue[d] that he should be permitted to retain *ownership* and request[ed] that the weapons be returned to a third-party designee of his choosing." *Garman*, 2006 U.S. Dist. LEXIS at **4-5 (emphases in original). The court denied this request based on *Felici* and *Howell*. *Garman*, 2006 U.S. Dist. LEXIS at **5-6. In addition, the court noted that denying the

---

[3] "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. . . ." Fed. R. Crim. P. 41(g).

defendant's request "is in keeping with the prophylactic purposes of § 922(g)," which are "to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Garman*, 2006 U.S. Dist. LEXIS at **6-7 (internal quotation marks omitted) (citing *United States v. Casterline*, 103 F.3d 76, 79 (9th Cir. 1996)).

¶15 Besides the lack of caselaw supporting Fadness's proposal, the District Court evidently was not persuaded by Fadness's and his father's claims that Fadness would not have constructive possession of his weapons if they were released to his parents. For one thing, the court noted, Chuck Fadness had no plan for selling the items and had not given the matter any thought. Furthermore, Fadness's parents were both in their 80s. Prior to his arrest in this matter, Fadness regularly visited his parents at their home in Idaho and had a key to their house. Chuck testified that he could lock up the firearms in his house "if that's what needs to be done." But when asked about his understanding of Fadness's ability to own or possess firearms, Chuck stated that Fadness has "never been in any trouble of any kind whatsoever no matter what it is."

¶16 In light of the foregoing, the District Court disposed of the Paragraph 7d items as follows. First, Item Number 22 (blackjack/sap), Item Number 24 (ASP expandable baton), and Item Number 33a (Gerber saws in nylon holster) were to be released to Fadness's father as agent for Fadness. Second, as agreed upon by the parties during the hearing, the Advanced Armament sound suppressor attached to Item Number 11 (one Walther 22 LR pistol, model P22) was to be separated from the pistol, treated as contraband, and sold by the Ravalli County Sheriff's Office to an authorized dealer, with

the proceeds from the sale distributed to Fadness's father as agent for Fadness. Third, "the remaining items in Paragraph 7d" were to be "disposed of, at the State's election, at public sale or auction, or to a licensed firearm dealer, with the proceeds to go to Fadness's father as agent for Fadness." It is this third disposition of "the remaining items in Paragraph 7d" that is at issue in this appeal.

### ISSUES

¶17 Fadness raises the following issues on appeal:

1. Did the District Court err in not releasing to Fadness's parents certain items in Paragraph 7d that are not firearms, ammunition, or deadly weapons?

2. Did the District Court err in determining that Fadness is not entitled to possession of the firearms, ammunition, and deadly weapons at issue?

3. Did the District Court abuse its discretion in releasing Fadness's firearms, ammunition, and deadly weapons to the State for it to sell (with the proceeds to go to Fadness's father) rather than to his parents for them to sell?

We reverse as to Issue 1 and affirm as to Issues 2 and 3.

### STANDARDS OF REVIEW

¶18 We review a trial court's conclusions of law de novo. *State v. Miller*, 2008 MT 106, ¶ 11, 342 Mont. 355, 181 P.3d 625. We determine whether the court correctly interpreted and applied the law. *State v. Robinson*, 2009 MT 170, ¶ 10, 350 Mont. 493, 208 P.3d 851; *State v. Warclub*, 2005 MT 149, ¶ 23, 327 Mont. 352, 114 P.3d 254. We will not disturb a trial court's factual findings unless they are clearly erroneous. *State v. Hass*, 2011 MT 296, ¶ 13, 363 Mont. 8, ___ P.3d ___. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm

11

conviction that a mistake has been made. *State v. Weaver*, 2008 MT 86, ¶ 9, 342 Mont. 196, 179 P.3d 534. The credibility of witnesses and the weight to be given their testimony are matters for the trial court to determine. *State v. Lally*, 2008 MT 452, ¶ 24, 348 Mont. 59, 199 P.3d 818. Lastly, we review discretionary rulings for abuse of discretion, which occurs when the trial court acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Wilson*, 2007 MT 327, ¶ 18, 340 Mont. 191, 172 P.3d 1264.

## DISCUSSION

¶19     ***Issue 1. Did the District Court err in not releasing to Fadness's parents certain items in Paragraph 7d that are not firearms, ammunition, or deadly weapons?***

¶20     It is well settled that the government may seize evidence for use in investigations and trial. *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1212 (10th Cir. 2001). Nevertheless, the government may not, by exercising its power to seize, effect a de facto forfeiture by retaining the seized property indefinitely. *Rodriguez-Aguirre*, 264 F.3d at 1212; *United States v. Premises Known as 608 Taylor Ave., Apt. 302*, 584 F.2d 1297, 1302 (3d Cir. 1978). "A criminal defendant is presumed to have the right to the return of his property once it is no longer needed as evidence, and the burden of proof is on the government to show that it has a legitimate reason to retain the property." *United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993) (internal quotation marks omitted). Therefore, the general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings to which it relates have terminated, unless it is then subject to forfeiture or other proceedings which are timely brought. *608 Taylor*

*Ave.*, 584 F.2d at 1302; *Rodriguez-Aguirre*, 264 F.3d at 1212; *Lee v. City of Chicago*, 330 F.3d 456, 466 (7th Cir. 2003). One theoretical premise underlying this rule is that "continued retention of evidence would constitute a taking without just compensation." *608 Taylor Ave.*, 584 F.2d at 1302 (citing *Lowther v. United States*, 480 F.2d 1031 (10th Cir. 1973)); *see also Lee*, 330 F.3d at 474-77 (Wood, J., concurring). Another court has observed that "it is fundamental to the integrity of the criminal justice process that property involved in the proceeding, against which no Government claim lies, be returned promptly to its rightful owner." *United States v. Wilson*, 540 F.2d 1100, 1103 (D.C. Cir. 1976). "Equitable principles would dictate as much." *Lee*, 330 F.3d at 466.

¶21 Montana adheres to the general rule. Under § 46-5-312, MCA, a person claiming the right to possession of property seized as evidence may apply to the judge for its return. The judge must give written notice to the prosecutor and all persons who have or may have an interest in the property and must hold a hearing to determine the right to possession. If the right to possession is established, the judge "shall" order the property, other than contraband, returned if: (a) the property is not needed as evidence, (b) the property is needed and satisfactory arrangements can be made for its return for subsequent use as evidence, or (c) all proceedings in which the property might be required have been completed. *See* § 46-5-312(1), (2), MCA.

¶22 Furthermore, as noted earlier, §§ 46-5-306 through -309, MCA, provide a procedure by which physical evidence in criminal cases may be destroyed or appropriated for law enforcement use when prosecutions have been completed and no further legal proceeding is contemplated or when it does not appear that criminal charges will be

13

initiated. Section 46-5-306, MCA. The petition filed by the prosecutor "must" state, among other things, "whether, in those instances in which the items are not contraband, an effort has been made to return the items to the apparent owner and the results of the effort." Section 46-5-307(1)(f), MCA.

¶23 Hence, our analysis necessarily begins with the presumption that Fadness has the right to the return of his property. Again, this appeal concerns only "the remaining items in Paragraph 7d." *See* ¶ 16, *supra*. Fadness requests that this property be released to his parents to be sold by them or held in trust for him while he serves his sentence on the instant offenses. The State, on the other hand, requests to sell these items at public sale or auction, or to a licensed firearms dealer. The basis of the State's request is twofold: (a) Fadness is a convicted felon, and it is unlawful under 18 U.S.C. § 922(g)(1) for a person convicted in any court of a felony to possess firearms or ammunition; and (b) one of the conditions on the suspended portion of Fadness's sentence prohibits him from owning, possessing, or being in control of any firearms or deadly weapons.

¶24 As Fadness points out, several of "the remaining items in Paragraph 7d" are *not* firearms, ammunition, or deadly weapons. For instance, he notes that some of the items are scope mounts, holsters, and cases. We agree with Fadness that the State has provided no basis, and the District Court cited no authority, for permitting the State to sell these items at public sale or auction. Fadness is entitled to have these items returned. It is necessary, therefore, to reverse the District Court's order in part, and remand with instructions to release to Fadness's parents those items within "the remaining items in Paragraph 7d" that *are not* firearms, ammunition, or deadly weapons.

14

¶25 We are left, then, with those items within "the remaining items in Paragraph 7d" that *are* firearms, ammunition, or deadly weapons. Fadness requests that we reverse the District Court's order and remand with instructions to release these items to Fadness's parents for them to sell. He argues two grounds for this, which we address under Issue 2 and Issue 3, respectively.

¶26 ***Issue 2. Did the District Court err in determining that Fadness is not entitled to possession of the firearms, ammunition, and deadly weapons at issue?***

¶27 Fadness first argues that "Montana law does not prohibit [him] from possessing firearms or dangerous weapons." He insists that he cannot be deprived "of his property, specifically his constitutionally protected right to arms."

¶28 We note that these assertions, on their surface, seem inconsistent with Fadness's position in the District Court. When asked by defense counsel at the hearing, "Are you trying to get your guns back?" Fadness replied, "No way." Fadness was clear that "I'm never going to be touching a gun again, period. So my main concern then is just being able to sell it at a fair price." Indeed, the issue addressed at the hearing was not whether Fadness should have his weapons back. Everyone appeared to agree that the weapons needed to be sold. The central issue was whether that should be done by Fadness's parents, by the State at public sale or auction, or by consignment.

¶29 Thus, it seems incongruous for Fadness now to be arguing that the District Court "erred when it held that [he] was not legally entitled to possession of his weapons and ammunition listed in paragraph 7d." However, while Fadness's briefing is elusive as to this seeming incongruity, his requested remedy remains the same: that the State be

15

ordered "to release the items in paragraph 7d to [Fadness's parents] for them to sell." Fadness's theory is that under *State v. Nelson*, 2008 MT 359, 346 Mont. 366, 195 P.3d 826, and *State v. Letasky*, 2007 MT 51, 336 Mont. 178, 152 P.3d 1288, he is not prohibited from possessing his "constitutionally protected" weapons and, therefore, the District Court should have released his property to his parents for them to sell, rather than to the State for it to sell. We reject this theory.

¶30    First, notwithstanding Fadness's repeated references to his constitutional right to bear arms, he cites no authority whatsoever for the proposition that this right guarantees to a convicted felon the right to possess firearms, ammunition, and deadly weapons. As the State notes, denying felons the right to possess firearms under 18 U.S.C. § 922(g)(1) has been upheld against Second Amendment[4] challenges. *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Vongxay*, 594 F.3d 1111, 1114-18 (9th Cir. 2010); *see also Dist. of Columbia v. Heller*, 554 U.S. 570, 626-27 & n. 26, 128 S. Ct. 2783, 2816-17 & n. 26 (2008) (cautioning that "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . ."; and characterizing such prohibitions as "presumptively lawful regulatory measures").

¶31    Similarly, Article II, Section 12 provides that "[t]he right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power

---

[4] "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

16

when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons." Like most constitutional rights, this right is not unlimited. *State v. Maine*, 2011 MT 90, ¶ 29, 360 Mont. 182, 255 P.3d 64 ("[M]ost constitutional rights are not absolute."); *see also e.g. State v. Hartsoe*, 2011 MT 188, ¶ 22, 361 Mont. 305, 258 P.3d 428 (the due process right to appear before a jury free from physical restraints "is not absolute"); *cf. Heller*, 554 U.S. at 626, 128 S. Ct. at 2816 ("Like most rights, the right secured by the Second Amendment is not unlimited."). It goes without saying that an incarcerated individual does not have the right to keep or bear arms while incarcerated,[5] and nothing in the plain language of Article II, Section 12 guarantees such a right. It is also axiomatic that the right of a felon to keep or bear arms may be regulated in the interest of public safety, and again nothing in the plain language of Article II, Section 12 states otherwise. In fact, in proposing Article II, Section 12 at the 1972 Constitutional Convention, the Bill of Rights Committee noted "that the statutory efforts to regulate the possession of firearms have been at the federal level and are, therefore, not subject to state Constitutional provisions. In addition, it is urged—and requires no citation—that the right to bear arms is subject to the police power of the state." Montana Constitutional Convention, Comments on the Bill of Rights Committee Proposal, Feb. 22, 1972, vol. II, p. 634; *see also* Montana Constitutional Convention, Verbatim Transcript, Mar. 8, 1972, pp. 1725-42, Mar. 9,

---

[5] Indeed, it is unlawful for a prisoner to purposely or knowingly possess or carry or have under the prisoner's custody or control without lawful authority a dirk, dagger, pistol, revolver, slingshot, sword cane, billy, knuckles made of any metal or hard substance, knife, razor not including a safety razor, or other deadly weapon. Section 45-8-318(1), MCA.

1972, pp. 1832-42 (twice rejecting a proposal to add "nor shall any person's firearms be registered or licensed" to Article II, Section 12, with several opponents of this language arguing that the decision to adopt registration and licensing requirements is a legislative, rather than constitutional, matter). Within the context of the present case, we find the following observations of the Fifth Circuit Court of Appeals to be on point and persuasive: "Irrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens."[6] *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004); *see also Vongxay*, 594 F.3d at 1118 (most scholars agree "that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)' " (ellipsis and brackets in original)). Fadness's conduct underlying his instant convictions—shooting at motorists for "[n]o reason," just "road rage" and "frustration at [their] high beam"—illustrates this point.

¶32 Second, *Nelson* does not stand for the proposition for which Fadness cites it. In *Nelson*, the district court imposed a condition on Nelson's sentence requiring him to obey all federal laws. The problem was that Nelson had the right under Montana's Medical Marijuana Act (MMA) to use medical marijuana, but the federal Controlled Substances

---

[6] Notably, the Fifth Circuit recognized an individual right to bear arms even before *Heller* was decided, but still found that "felons . . . may be prohibited from possessing firearms." *United States v. Emerson*, 270 F.3d 203, 260, 261 (5th Cir. 2001).

18

Act (CSA) prohibited the possession of marijuana and provided no exception for the use of medical marijuana under state law. Thus, Nelson argued that in requiring him to obey all federal laws, the district court was improperly enforcing federal law and contravening state law. *Nelson*, ¶¶ 7-9, 12, 14. This Court agreed with Nelson that the district court had exceeded its authority in imposing the condition, insofar as it could be invoked to support a revocation of his deferred sentence. *Nelson*, ¶ 36. We noted that it is an axiom of federalism under the United States Constitution that Congress does not have the authority to commandeer the processes of states by directly compelling them to enact and enforce a federal regulatory program. *Nelson*, ¶ 36. The MMA, we observed,

> is a valid exercise of Montana's police power under the dual state and federal structure embodied in the United States Constitution. The MMA does not in any way prohibit the federal government from enforcing the CSA against medical marijuana users like Nelson if it chooses to do so; however, a state court may not, under these circumstances, use violation of the federal law as a justification for revocation of a deferred sentence.

*Nelson*, ¶ 37. Thus, we held that while the district court could require Nelson to obey all federal laws, "it must allow an exception with respect to those federal laws which would criminalize the use of medical marijuana in accordance the MMA." *Nelson*, ¶ 37.

¶33 Fadness reads this holding too broadly. He asserts that if the federal government wants to bring criminal charges against him under 18 U.S.C. § 922(g)(1) for possessing firearms or ammunition, it may do so; but a Montana district court cannot deprive him of "property to which he has a protected right under state law" so as to keep him from violating this statute. There are two flaws in this argument. For one thing, whereas Nelson had a statutorily conferred right to possess and use medical marijuana, Fadness

19

cites no provision of Montana law granting him, a convicted felon, a "protected right" to possess firearms and ammunition while serving his sentence. More importantly, holding that a district court may not require a defendant to obey federal law insofar as doing so would preclude him from exercising his rights under state law (*Nelson*) is not the same as holding that a district court must return to the defendant property that under federal law he is not allowed to possess (Fadness's theory). While the district court in *Nelson* could not prohibit Nelson from acquiring, possessing, and using medical marijuana under the MMA, we did *not* hold that the district court had to be his supplier—which is essentially what Fadness would have us do here. It is unlawful under 18 U.S.C. § 922(g)(1) for a person convicted in any court of a felony to possess firearms or ammunition. We refuse to require a Montana district court to participate in a defendant's violation of this law. *Howell*, 425 F.3d at 977 ("Obviously, the courts cannot participate in a criminal offense by returning firearms to a convicted felon."). Indeed, "[r]equiring a court to return firearms to a convicted felon would not only be in violation of a federal law, but would be contrary to the public policy behind the law." *Howell*, 425 F.3d at 976.

¶34 Third, Fadness's reliance on *Letasky* is also misplaced. Letasky was sentenced to 365 days in jail with all but 3 days suspended on the condition that he have no contact with the victim, his ex-wife. *Letasky*, ¶¶ 4, 12. Letasky thereafter contacted his ex-wife. Thus, the Billings Municipal Court revoked his suspended sentence, assessed a fine, and reiterated that "there is still a no contact order with the victim." *Letasky*, ¶¶ 5-6. Meanwhile, a Billings police officer filed a separate complaint alleging that Letasky had committed criminal contempt by contacting his ex-wife in violation of the terms and

conditions of his suspended sentence. *Letasky*, ¶ 7. On appeal, we held that Letasky's motion to dismiss this charge should have been granted. The criminal contempt statute made it unlawful for a person to purposely disobey or refuse "any lawful process or other mandate of the court." *Letasky*, ¶ 10. The municipal court, however, did not "mandate" that Letasky have no contact with his ex-wife. Rather, the court suspended his sentence *on the condition* that he have no contact with his ex-wife. Thus, he could not be found in contempt for violating a "mandate of the court." *Letasky*, ¶ 13.

¶35 The State had argued that no difference exists between a condition of a suspended sentence and a "mandate of the court," since both direct the defendant to do or refrain from doing a specific act. *Letasky*, ¶ 14. We rejected this view, explaining that

> [a] condition of a suspended sentence, unlike an order of the court, is not an independent mandate of the court. A condition of a suspended sentence represents a requirement that the Montana Code permits a court to place upon its order suspending an offender's sentence. Section 46-18-201(4), MCA. A condition of a suspended sentence would be meaningless without reference to the independent mandate, specifically, the order of suspended sentence, that it conditions.

*Letasky*, ¶ 15. We acknowledged that an offender may be prosecuted for a crime if the facts that establish the offender's noncompliance with a sentencing condition also establish the elements of a crime. But the offender may not be prosecuted "based only on the breach of the condition itself." *Letasky*, ¶ 18.

¶36 Fadness reads *Letasky* as standing for the proposition that "while the State could seek to revoke the suspended portion of [his] sentence for violating the condition prohibiting him from possessing firearms, the existence of the condition does not make it illegal for him to possess firearms." It is true that Fadness may not be prosecuted based

21

solely on the breach of the condition itself. *Letasky*, ¶ 18. It is also true that conditioning a defendant's suspended sentence on the requirement that he refrain from doing a specific act—e.g., do not possess firearms, do not enter bars and casinos, or do not leave your assigned district without the permission of your probation and parole officer—does not, in and of itself, make the commission of these acts illegal. *Letasky*, ¶¶ 14-15. It does not follow, however, that Fadness is entitled to the return of his weapons. As a condition of his suspended sentence, Fadness may "not own, possess, or be in control of any firearms or deadly weapons." Fadness does not challenge this condition as illegal, and we note that the District Court was specifically authorized to prohibit him from "owning or carrying a dangerous weapon" if "necessary to obtain the objectives of rehabilitation and the protection of the victim and society." Section 46-18-202(1)(b), MCA (2005). Such necessity appears on the record here.[7] It is absurd, then, to suggest that the District Court, having lawfully imposed the restriction that Fadness not own, possess, or be in control of any firearms or deadly weapons, was required to give Fadness possession of the very items that the court had directed him, as a condition of his sentence, not to possess. Courts may not participate in a defendant's violation of sentencing conditions.

¶37 To summarize, the starting presumption (as stated under Issue 1) is that Fadness has the right to the return of his property. Federal law, however, prohibits Fadness from

_____

[7] Given the nexus between the condition and Fadness's offense, the condition also could have been imposed under § 46-18-202(1)(f), MCA (2005), which authorizes "any other limitation reasonably related to the objectives of rehabilitation and the protection of the victim and society." *See State v. Johnson*, 2011 MT 286, ¶ 19, 362 Mont. 473, ___ P.3d ___ ("In order for the condition to be reasonably related to the objectives of rehabilitation and the protection of the victim and society, the condition must have a nexus to the offender or the offense for which the offender is being sentenced.").

possessing any firearms or ammunition. Likewise, one of the conditions of his suspended sentence is that he not own, possess, or be in control of any firearms or deadly weapons. Fadness has not identified any constitutional or statutory provision that would negate these prohibitions. A district court may not participate in the violation of a federal law or a valid sentencing condition by returning items to a defendant who is not allowed to possess them. Accordingly, the District Court did not err in denying Fadness possession of the firearms, ammunition, and deadly weapons in Paragraph 7d.

¶38 ***Issue 3. Did the District Court abuse its discretion in releasing Fadness's firearms, ammunition, and deadly weapons to the State for it to sell (with the proceeds to go to Fadness's father) rather than to his parents for them to sell?***

¶39 Fadness next argues that, even if he is prohibited from possessing his weapons, the State failed to establish that he would do so if these items were released to his parents. Fadness relies on the following definition of "constructive possession":

> "Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another."

*State v. Caekaert*, 1999 MT 147, ¶ 10, 295 Mont. 42, 983 P.2d 332 (quoting *State v. Meader*, 184 Mont. 32, 43, 601 P.2d 386, 392 (1979)). Fadness contends that he would not have constructive possession of his weapons if they were turned over to his parents. He observes that the weapons will not be "immediately and exclusively accessible" to him during his incarceration. He further asserts that he will have no "dominion and control" over anything in his parents' house while he is incarcerated. He states that his parents intend to sell the weapons, and that even if the weapons are not all sold by the

23

time of his release from prison,[8] Fadness does not own his parents' house, he does not intend to live there, and the guns can be secured in a metal case to which he will not have the key or access to the key. Fadness concludes that because he "would not possess the weapons if given to his parents to sell, the State has no authority to dispose of his property though its own sale."

¶40 The crux of the matter is how Fadness's property, which he no longer is entitled to possess, should be disposed of. The statutory scheme affords district courts broad discretion in this regard. Section 46-5-308(1), MCA, states that "[t]he court may enter an order providing for the destruction or disposition of the evidence," taking into account any statements provided by the victim of the offense. The prosecutor is required to present the court with a proposed order which "may include":

> (a) authorization to destroy all contraband listed in the petition, the method of destruction, and the time within which the destruction must be accomplished;
> (b) if certain contraband is requested by the petitioner for training or law enforcement purposes, authorization to use the items and a description of each;
> (c) if the petition requests training or law enforcement use of noncontraband items, authorization to retain the items by the law enforcement agency and a description of the items;
> (d) if the evidence is money and the owner cannot be ascertained and no civil forfeiture action is pending, authorization to deposit the money to the appropriate city, county, or state drug forfeiture fund;
> (e) if the petition requests, authorization to sell noncontraband property at public sale or auction and to deposit the proceeds to the appropriate city, county, or state drug forfeiture fund; or
> (f) authorization to destroy all items not otherwise provided for.

Section 46-5-308(1), MCA.

---

[8] Fadness was eligible for parole in September 2011, which the Board of Pardons and Parole denied. He was directed to reappear before the Board in August 2016.

¶41 Here, the District Court ordered "that the remaining items in Paragraph 7d shall be disposed of, at the State's election, at public sale or auction, or to a licensed firearm dealer, with the proceeds to go to Fadness's father as agent for Fadness." Section 46-5-308(1)(e), MCA, specifically contemplates the sale of noncontraband property[9] at public sale or auction. Granted, this provision also contemplates that the proceeds will be deposited "to the appropriate city, county, or state drug forfeiture fund." However, given the language "may include" in the statute, we do not deem this disposition—or, more generally, the list provided in § 46-5-308(1)(a)-(f), MCA—to be exclusive or the only option available to the court. Moreover, as noted, the general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings to which it relates have terminated, unless it is then subject to forfeiture or other proceedings which are timely brought. *See* ¶ 20, *supra*. Selling a defendant's property which has not been subjected to timely forfeiture proceedings and which, absent his conviction in the underlying matter, the defendant would have the lawful right to possess, but then not delivering to the defendant the proceeds from the sale of this property, could implicate constitutional concerns. *See e.g. Lee*, 330 F.3d at 466 & n. 5 (observing that "due-process guarantees" prevent the government from effecting "*de facto* forfeitures of property by retaining items indefinitely"; and noting that "[o]ther courts have likened continued retention of evidence as a taking without just

---

[9] While Fadness's firearms and ammunition are now contraband *as to him*, *see* § 46-5-307(1)(d), MCA ("contraband" means "any property that is unlawful to produce or possess"); 18 U.S.C. § 922(g)(1) (it is unlawful for a felon to possess firearms or ammunition), they are noncontraband as to other individuals who are not prohibited by law from possessing these items.

compensation"). For these reasons, we hold that allowing the State to sell the items at public sale or auction, or to a licensed firearms dealer, with the proceeds to go to Fadness's father as agent for Fadness, was a valid option for the District Court to select for the disposition of Fadness's property under § 46-5-308, MCA.

¶42 The only remaining question is whether the District Court should have instead selected the option requested by Fadness: that his weapons be released to his parents for them to sell. As discussed earlier, this same District Court in the *Severson* case found that releasing the defendant's firearms to a third party would not afford the defendant constructive possession of the weapons because there was no indication that Severson would have control over the firearms after their release or that he intended to receive proceeds from their sale. 2000 Mont. Dist. LEXIS at **5-6.

¶43 Likewise, in *Parsons* (a federal district court case from Iowa), Parsons did not seek to have his friend, Aloia, hold his firearm collection in trust for him. Rather, he wished to designate that his firearm collection, which was in the government's possession at the time, be given to Aloia. Aloia provided testimony, which the court found credible, that if the firearms were released to him, he intended to have a federally licensed firearms dealer in his home state of Arizona sell some of them, he would keep the remainder, and he solely would determine what to do with the proceeds of the sale. Aloia stated that he would not permit Parsons to see or possess any of the firearms he retained from the firearm collection. This arrangement, the court found, did not rise to the level of constructive possession. *Parsons*, 472 F. Supp. 2d at 1175. Notably, the court distinguished the Eleventh Circuit's decision in *Howell* on the ground that

26

the relief that defendant Parsons is requesting in this case, merely to be able to designate to whom his firearm collection should be given is not the same relief sought in *Howell*, in which the defendant there sought to have the court place the firearms in the possession of a relative in trust or to have the firearms sold and the proceeds distributed to him. *See Howell*, 425 F.3d at 977. The relief being sought in *Howell* was far more characteristic of full ownership than that which Parsons seeks in this case.

*Parsons*, 472 F. Supp. 2d at 1176.

¶44 It would have been within the District Court's discretion here to release Fadness's weapons to his parents for them to sell on his behalf, but only if doing so would not result in Fadness's having "actual" or "constructive" possession of the weapons. *See Meader*, 184 Mont. at 42-43, 601 P.2d at 392 (defining these two terms). In fact, the District Court carefully examined the dispositions in *Severson* and *Parsons*. On considering the testimony of Fadness and his father, however, it appears the court did not find credible their assurances that Fadness would not "maintain[ ] control or a right to control" his weapons if they were released to his parents. *Meader*, 184 Mont. at 43, 601 P.2d at 392 (definition of "constructive possession"). While Fadness disputes the court's assessment, the credibility of witnesses and the weight to be given their testimony are matters for the trial court to determine. *Lally*, ¶ 24.

¶45 More importantly, even if the District Court had concluded that Fadness would *not* have constructive possession of his weapons upon their release to his parents, the court was not then obligated to adopt that disposition. Fadness's expressed desire was not to give his guns away to a third party; it was to get a fair price for them and have the proceeds available to him upon his release from prison. The District Court observed that Chuck Fadness, who was 85 at the time of the hearing, admittedly had no plan for selling

27

the guns and had not given the matter any thought. Chuck "imagined" that he might advertise the guns in the paper "or something" and sell them that way. He stated that he was aware gun prices varied from place to place, and he wanted them sold wherever Fadness could get the most for them, but he had no idea where that would be. The court attempted to broker a compromise under which the items would be sold on consignment, at fair market value, through a licensed firearms dealer with a retail used gun establishment in Ravalli County or Missoula County, to be chosen by Fadness, with the proceeds (less the dealer's commission) going to Fadness. Fadness, however, adopted an all-or-nothing stance and rejected any proposal that did not involve his parents selling the guns.

¶46 In these circumstances, the District Court did not abuse its discretion in allowing the State to sell Fadness's firearms, ammunition, and deadly weapons at public sale or auction, or to a licensed firearms dealer, with the proceeds to go to Fadness's father as agent for Fadness, rather than releasing the items to Fadness's parents who had no plan for selling them and little or no knowledge about how to do so.

**CONCLUSION**

¶47 For the reasons discussed under Issue 1, the District Court's January 4, 2011 Opinion & Order is reversed in part and the case is remanded with instructions to release to Fadness's parents "the remaining items in Paragraph 7d" that *are not* firearms, ammunition, or deadly weapons. For the reasons discussed under Issue 2 and Issue 3, Fadness is not entitled to possession of "the remaining items in Paragraph 7d" that *are* firearms, ammunition, or deadly weapons, and the District Court did not abuse its

28

discretion in ordering the State to sell these items and give the proceeds to Fadness's father as agent for Fadness.

¶48 Affirmed in part, reversed in part, and remanded for further proceedings.


/S/ JAMES C. NELSON


We Concur:

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE
/S/ BRIAN MORRIS


Justice Jim Rice, concurring.

¶49 I concur on all issues. Under Issue 1, I would note that possession of firearm accessories has been charged, in conjunction with possession of firearms, as a violation of 18 U.S.C. § 922(g)(1). *See United States v. Twenty-Eight Firearms, Assorted Firearm Ammunition, and Firearm Accessories*, 2008 U.S. Dist. LEXIS 88953 at *1, *5 (M. D. Tenn. Oct. 31, 2008). Here, the State made no argument opposing Fadness' separate request for return of the accessories, and thus I agree with the Court's resolution of the issue upon the authorities cited.


/S/ JIM RICE